PD-0713-15
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 6/10/2015 3:49:35 PM
Accepted 6/11/2015 4:00:54 PM
ABEL ACOSTA
CLERK

NO. _____

TO THE COURT OF CRIMINAL APPEALS OF TEXAS

CORY MARTIN COLVIN, Appellant

VS.

THE STATE OF TEXAS, Appellee

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

APPELLANT'S PETITION FOR DISCRETIONARY REVIEW

\*\*\*\*\*\*\*\*\*\*\*\*\*\*

FROM THE COURT OF APPEALS

SIXTH APPELLATE DISTRICT OF TEXAS

AT TEXARKANA

NO. 06-14-00163-CR

UPSHUR COUNTY

TRIAL COURT NO. 16,601

Tim Cone
P.O. Box 413
Gilmer, Texas  75644
State Bar #04660350

FILED IN
COURT OF CRIMINAL APPEALS

June 11, 2015

ABEL ACOSTA, CLERK

ATTORNEY FOR APPELLANT

TABLE OF CONTENTS

                                                          Page
Table of Contents…………………………………………….     2

Name of All Parties…………………………………     3

Index of Authorities…………………………………     4

Statement of the Case………………………………….     5

Statement of the Procedural History……………………..     7

Statement Declining Oral Argument…………………….     8

Questions for Review…………………………………     8 & 9

       Question One: Did the Court of Appeals improperly analyze the issue of custody when they held the Appellant was not in custody when the investigating officer assured the Appellant he would not be arrested at the end of the interview and then arrested him at the end of the interview?

Reasons for Review……………………………………     9

Argument and Authorities………………………………..     9

Prayer and Relief………………………………………     11

Certificate of Compliance………………………………..     11

Certificate of Service……………………………………..     12

Appendix – Court of Appeals Opinion

## NAMES OF ALL PARTIES

The parties to the trial court's judgment are the State of Texas and Appellant, Cory Martin Colvin, TDCJ.

The trial court judge was the Honorable Lauren Parish, 115th Judicial District Court, Upshur County, Texas.

At trial, the State was represented by Upshur County District Attorney Billy Byrd, Assistant District Attorneys A. Camille Henson and Natalie Miller, Upshur County, Texas, and on appeal by Natalie A. Miller, Upshur County Assistant District Attorney, Gilmer, Texas.

Appellant was represented at trial by Dwight Brannon, P.O. Box 670, Gilmer, Texas, and on appeal by Tim Cone, Gilmer, Texas.

## INDEX OF AUTHORITIES

PAGE

CASES;

 Miranda v Arizona, 384 U.S. 436 (1966)……………….……….    10


STATUTES:

Texas Code of Criminal Procedure, Art. 38.22………….....    10



RULES:

Texas Rule of Appellate Procedure, 66.3(f)……………….…    9

CORY MARTIN COLVIN                    Appellant

V.

THE STATE OF TEXAS                    Appellee


**\*\*\*\*\*\*\*\*\*\***

APPELLANT'S PETITION FOR DISCRETIONARY REVIEW

**\*\*\*\*\*\*\*\*\*\***

TO THE HONORABLE COURT OF APPEALS:

Comes now Cory Martin Colvin, Appellant, and respectfully urges this Court to grant discretionary review in this case.


## STATEMENT OF THE CASE

Cory Martin Colvin appeals his conviction for the offense of Aggravated Sexual Assault of a Child. On November 26, 2013, the Appellant was indicted for the above referenced offense alleging he penetrated the mouth of a child (C.T.) younger than fourteen with his sexual organ on or about July 18, 2013. CR8. Originally, the trial court appointed Charles Van Cleef to represent the Appellant. CR9. Later, Attorney Barry

Wallace was appointed to represent the Appellant but Dwight Brannon was finally appointed. CR 100,102. On May 14, 2014, the State filed a notice of intent to introduce an outcry statement. CR120, 122. The first notice actually applies to the child the subject of the extraneous matter (C.M.) and the second notice applied to the child the subject of the indictment in the case at bar. On May 30, 2014, the Appellant's trial counsel filed a motion and order requesting the Appellant be examined for competency and insanity. CR130. The motion was granted and the court ordered the Appellant be examined by Dr. Tom Allen. CR133. Although the record provided for preparation of this brief does not contain a report from Dr. Allen, Appellant's trial counsel is in receipt of a report filed by Dr. Allen on June 20, 2014, finding the Appellant competent. Appellant's trial counsel also filed a notice to raise an insanity defense on May 30, 2014. CR 129. No insanity defense was presented at trial.

On August 11, 2014, a pretrial hearing was held regarding a rejected plea offer. 2RR. A jury was selected on the same day with an understanding that a pretrial hearing regarding a statement given by the Appellant and the issue of an outcry witness would be held prior to the beginning of the trial. 2RR8, 3RR.

On August 12, 2014, a pretrial hearing was held regarding the Appellant's statement to the police and on the issue of the outcry witness. The Appellant testified at the hearing for the limited purpose of the statement issue. The trial court ruled the outcry statement to be admissible (which included the outcry from C.T. and C.M.) 4RR66. The trial court advised a ruling regarding the Appellant's statement would be made before the trial started. 4RR66.

On August 14, 2014, the trial was to begin. Prior to the beginning of the trial a juror was dismissed by the trial court and replaced with the alternate juror. 5RR6-15. Further, prior to trial, the trial court ruled the Appellant's statement was admissible. 5RR17,18. The jury convicted the Appellant of the indicted offense the following day and, after a punishment hearing, the jury assessed a sentence of 99 years confinement. 6RR51,114.

For clarity, THE STATE OF TEXAS will be referred to as "The State", and CORY MARTIN COLVIN, will be referred to as "Defendant" or "Appellant."

## STATEMENT OF PROCEDURAL HISTORY

The case was appealed to the Court of Appeals, Sixth Appellate District of Texas at Texarkana. On May 12, 2015, that Court affirmed the conviction in an opinion that was published. There was no motion for rehearing filed.

## STATEMENT DECLINING ORAL ARGUMENT

Oral argument of this case is not requested on behalf of Appellant.

## QUESTIONS FOR REVIEW

Question No.1

Did the Court of Appeals improperly analyze the issue of custody when they held the Appellant was not in custody when the investigating officer assured the Appellant he would not be arrested at the end of the interview and then arrested him at the end of the interview?

REASONS FOR REVIEW

Texas Rule of Appellate Procedure 66.3(f): A Court of Appeals has so far departed from the accepted and usual course of proceedings as to call for an exercise of the Court of Criminal Appeals power of supervision. Further, this matter should be addressed by the Court of Criminal Appeals in the best interest of justice.

ARGUMENT AND AUTHORITIES

Question No. 1

Did the Court of Appeals improperly analyze the issue of custody when they held the Appellant was not in custody when the investigating officer assured the Appellant he would not be arrested at the end of the interview and then arrested him at the end of the interview?

The trial court held a hearing on the Appellant's Motion to Suppress relating to the confession he gave to investigating officer Bruhn. The Appellant was interviewed at the Sheriff's office in Upshur County and was told by the investigator that he was not under arrest and would be arrested on

that day no matter what the Appellant told the investigator. At the hearing on the Motion to Suppress, the issue of admissibility was focused on the voluntariness aspect of the interview and, separately, the fact that no "Miranda" warning was given or the warnings set out for a custodial interview pursuant to Texas Code of Criminal Procedure, Art. 38.22. It is clear from the record, no warnings were given and the issue of custody would be strongly in favor of the State and the opinion of the Court of Appeals if the investigator had freed the Appellant after the interview. This Appellant was assured by the investigator he would be free to leave at the end of the interview no matter what the Appellant said. The investigator told him, "Anything you tell me, I'm not going to put you in jail today." Then, after the Appellant made incriminating statements, the investigator did exactly what he assured the Appellant he would not do-he put the Appellant in jail. This set of circumstances clearly affect the analysis of the voluntariness of the statement and the issue of whether custody existed at the time the Appellant made incriminating statements without proper warnings. The Court of Appeals upheld the trial court, which found the statements voluntary and the Appellant not in custody. The problem with the analysis is that it is incorrect. The investigator did exactly what he assured the Appellant he would not do. The incriminating statements were made in

response to a promise made by the investigator that the investigator broke. The only logical conclusion regarding custody is that The Appellant was not free to leave and, therefore, was in custody. The failure to give proper warnings requires the statements to be excluded from admission.

## PRAYER AND RELIEF

Appellant prays that this Petition for Discretionary Review be granted; that this case be submitted to the Court after full briefing; that the Court of Appeals' decision be set aside, the case remanded to the Court of Appeals for further review or that the Appellant receive a new trial.

Respectfully submitted,

/s/ Tim Cone

_____
TIM CONE
State Bar #04660350
Attorney for Appellant
P.O. Box 413
Gilmer, Texas  75644
903-725-6270
903-725-5494 (Fax)

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing document complies with Texas Rules of Appellate Procedure, Rule 9 regarding length of documents, in that exclusive of caption, identify of parties and counsel, statement regarding oral argument, table of contents, index of authorities, statement of the case, statement of issues presented, statement of jurisdiction, statement of procedural history, signature, proof of service, certification, certificate of compliance, and appendix, it consist of 391 words.

/s/Tim Cone

_____

TIM CONE

## CERTIFICATE OF SERVICE

On the 10th day of June, 2015, copies of the foregoing Appellant's Petition for Discretionary Review were delivered to the Office of Honorable Billy Byrd, Upshur County District Attorney, 405 N. Titus, Gilmer, Texas 75644, and the State Prosecuting Attorney, at P.O. Box 13046, Capitol Station, Austin, Texas 78711, by United States mail postage prepaid.

/s/Tim Cone

_____

TIM CONE
Counsel for Appellant

APPENDIX-COURT OF APPEALS OPINION



# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-14-00163-CR

_____

CORY MARTIN COLVIN, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 115th District Court
Upshur County, Texas
Trial Court No. 16,601

Before Morriss, C.J., Moseley and Burgess, JJ.
Opinion by Justice Moseley

O P I N I O N

A jury convicted Cory Martin Colvin of aggravated sexual assault of a child, and he was sentenced to ninety-nine years' imprisonment. On appeal, Colvin argues that the trial court erred (1) by improperly excusing a juror and replacing her with an alternate juror, (2) by admitting extraneous-offense evidence, (3) by admitting unwarned statements Colvin made to an investigating officer, and (4) by allowing the State to impeach Colvin's trial testimony with a prior inconsistent statement made during a pretrial hearing.

We find that the trial court did not abuse its discretion in either excusing a juror who became unable to serve or in applying Article 38.37 of the Texas Code of Criminal Procedure to allow for the introduction of extraneous-offense evidence. We further find that Colvin was not in custody at the time of his confessions to the investigating officer and that no prior inconsistent statement was used to impeach Colvin. Accordingly, we affirm the trial court's judgment.

I.      **The Trial Court Did Not Abuse Its Discretion in Removing and Replacing a Juror**

During voir dire, prospective jurors were informed that Colvin was charged with aggravated sexual assault of a child. After discussing the unpleasant nature of the case, the State asked the panel whether there was any reason, including a "moral, spiritual, philosophical, or religious reason" that would prevent them from focusing on the evidence or otherwise serving on the jury. Nancy Jane Monts was selected as a juror after she failed to respond to counsel's inquiries. During a short break, taken after the jury was selected, Monts tearfully informed the bailiff, Becky Pope, that she did not expect to be selected and did not wish to sit on the jury. Before

2

the panel was sworn, the trial court reported Monts' wishes to counsel, stating, "We have a juror who has small children, doesn't think she can go through [with] this, she's in there crying."

Colvin objected to Monts' discharge, and the trial court decided to hear the matter on the morning of trial. During that hearing, Pope testified that Monts was visibly upset after she had been selected on the jury. Monts told the trial court that she initially felt as if she could set her feelings about the nature of the case aside. However, after her daughters texted her during the break, Monts realized that she could not control her emotions and could not serve on the jury. Monts also claimed that she was sick. She testified, "I woke up with a headache and it's just become a full, a migraine, and it's making me nauseous."

After Monts' testimony, Colvin argued,

Your Honor, . . . of course [] the fact that she's sick today could be a determination by the Court that she has become unable to serve and it falls right in with 33.011 of the Texas Code of Criminal Procedure, subsection B. However, . . . she had not become disqualified or disabled -- well, she became disabled afterwards -- but disqualified to perform as a juror under the law after the jury was seated but before it heard any evidence and before it's sworn[.][1] [Monts] made that decision while there was still a possibility to cure it before and I just don't think the statute clearly addresses this situation and we, therefore, object to the alternate being substituted. Of course, we object to her sitting, Ms. Monts sitting as a juror, and since a defendant must be tried before twelve jurors under this situation we move for a mistrial.[2]

After finding that Monts was both disqualified and unable to serve, the trial court released and replaced her with an alternate juror.

---

[1]At a previous hearing, Colvin had also conceded that Monts was disqualified to serve as a juror.

[2]Colvin does not raise a point of error arguing that the trial court erred in overruling his motion for mistrial.

3

On appeal, Colvin argues that the trial court improperly excused Monts because the evidence at the hearing "did not establish that she was disqualified from serving as a jury [member]."

This issue is governed by Article 33.011 of the Texas Code of Criminal Procedure, which states, "Alternate jurors . . . shall replace jurors who, prior to the time the jury renders a verdict on the guilt or innocence of the defendant . . . , become or are found to be unable or disqualified to perform their duties . . . ."  TEX. CODE CRIM. PROC. ANN. art. 33.011(b) (West Supp. 2014). "Although the statute does not define 'unable to perform,' appellate courts have concluded that 'unable' as used in Article 33.011 is indistinguishable from 'disabled' as used in Article 36.29." *Whitehead v. State*, 437 S.W.3d 547, 554 (Tex. App.—Texarkana 2014, pet. ref'd).  As utilized in Article 36.29, Texas courts have interpreted the term "disability"

> to require that the juror is suffering from a "physical illness, mental condition, or emotional state that would hinder or inhibit the juror from performing his or her duties as a juror," or that the juror [is] suffering from a condition that inhibit[s] h[er] from "fully and fairly performing the functions of a juror."

*Id*. at 555 (quoting *Scales v. State*, 380 S.W.3d 780, 783 (Tex. Crim. App. 2012)); *see* TEX. CODE CRIM. PROC. ANN. art. 36.29 (West Supp. 2014).

"In deciding to remove a juror, the trial court must make a finding, sufficiently supported by the record, that the juror was disqualified or unable to perform the duties of a juror." *Whitehead*, 437 S.W.3d at 554.  Because "[t]he trial court has discretion to determine whether a juror has become disabled and to seat an alternate juror," we review the trial court's decision to replace a juror with an alternate juror for an abuse of discretion. *Id.* (citing *Scales*, 380 S.W.3d at 783).  The trial court's "ruling must be upheld if it is within the 'zone of reasonable disagreement.'" *Id*.

4

(quoting *Scales*, 380 S.W.3d at 784). Accordingly, "[w]e may not substitute our own judgment for that of the trial court. Instead, we are to assess whether, after viewing the evidence in the light most favorable to the trial court's ruling, the ruling was arbitrary or unreasonable." *Id.*

While counsel objected to Monts' release, he agreed that she was disqualified to serve as a juror. Monts' and Pope's testimony established that Monts was suffering from physical illness or an emotional state that would hinder or inhibit her from performing her duties as a juror. In light of Monts' testimony and Colvin's concessions, we find no abuse of discretion in the trial court's decision to release Monts and replace her with an alternate juror. Accordingly, we overrule Colvin's first point of error.

## II. Trial Court Did Not Abuse Its Discretion in Admitting Evidence Under Article 38.37

The State's indictment in this case alleged that Colvin penetrated the mouth of Jane Doe, a child younger than fourteen years of age, with his sexual organ.[3] Prior to (and during) trial, Colvin objected to evidence of extraneous acts committed against Jane's foster sister, Jamie Doe.[4] During a pretrial hearing, the outcry witness testified that Jamie informed her that Colvin had kissed her "[b]etween her neck and her chest," had "tried to force his penis up her shorts," had "pulled the waistband of her shorts back and took a picture" of her bottom, and had touched her vagina with his genitals. After hearing this evidence, the trial court overruled Colvin's objection.

---

[3]Jane Doe testified that when she was eleven years old, Colvin "put his male parts in [her] mouth" and "put his hand over [her] head and . . . pushed it down." Colvin does not challenge the sufficiency of the evidence supporting his conviction.

[4]At trial, Jamie testified that when she was twelve years old, Colvin kissed her on the neck and "would . . . try to stick his penis up [her] shorts" and that his male sexual organ touched "[t]he skin" of her vagina.

5

"A trial court's ruling on the admissibility of extraneous offenses is reviewed under an abuse-of-discretion standard." *Devoe v. State*, 354 S.W.3d 457, 469 (Tex. Crim. App. 2011); *see Cameron v. State*, 241 S.W.3d 15, 19 (Tex. Crim. App. 2007). "A trial court does not abuse its discretion if the decision to admit evidence is within the 'zone of reasonable disagreement.'" *Marsh v. State*, 343 S.W.3d 475, 478 (Tex. App.—Texarkana 2011, pet. ref'd) (quoting *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990) (op. on reh'g)). "If the trial court's decision on the admission of evidence is supported by the record, there is no abuse of discretion, and the trial court will not be reversed." *Id.* (citing *Osbourn v. State*, 92 S.W.3d 531, 537 (Tex. Crim. App. 2002); *Montgomery*, 810 S.W.2d at 379). We will not substitute our own decision for that of the trial court. *Id.* (citing *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003)).

Pointing solely to Rule 404 of the Texas Rules of Evidence, Colvin argues on appeal that the trial court erred in allowing evidence of the extraneous offenses because "[e]xtraneous matters are [not] admissible . . . simply to prove the accused acted in conformity with his character." As we explain below, Colvin is incorrect.

In response to Colvin's objection at trial, the State argued that it sought to admit character and propensity evidence pursuant to Article 38.37 of the Texas Code of Criminal Procedure. Article 38.37 contains a rule of evidence applicable to certain types of sexual abuse cases, including this one. TEX. CODE CRIM. PROC. ANN. art. 38.37 (West Supp. 2014). The Rule "allow[s] evidence that a person had committed certain previous criminal offenses with any child victim to be admitted into trials for certain offenses with child victims." House Comm. on

Criminal Procedure Reform, Select, Bill Analysis, Tex. S.B. 12, 83d Leg., R.S. (2013); *see* Senate Comm. on Criminal Justice, Bill Analysis, Tex. S.B. 12, 83d Leg., R.S. (2013); Act of May 17, 2013, 83d Leg., R.S., ch. 387, § 1, secs. 2, 2–a, 2013 Tex. Gen. Laws 1167, 1167–68 (effective Sept. 1, 2013). Specifically, Article 38.37, Section 2(b) provides that "[n]otwithstanding Rules 404 and 405 [of the] Texas Rules of Evidence," evidence that a defendant committed a separate sexual or assaultive offense against a child "may be admitted in the trial" for an alleged offense of aggravated sexual assault of a child "for any bearing the evidence has on relevant matters, including the character of the defendant and acts performed in conformity with the character of the defendant." TEX. CODE CRIM. PROC. ANN. art. 38.37, § 2(b).

Colvin's appellate brief relies solely on Rule 404 of the Texas Rules of Evidence and makes no mention of Article 38.37. Because evidence of Colvin's extraneous acts against Jamie were admitted pursuant to Article 38.37, we find no abuse of discretion in the trial court's evidentiary ruling. Accordingly, we overrule Colvin's second point of error.[5]

## III. Colvin Was Not in Custody at the Time of His Confessions

Custodial interrogation places "'inherently compelling pressures' on the persons interrogated." *Thompson v. Keohane*, 516 U.S. 99, 107 (1995) (quoting *Miranda v. Arizona*, 384 U.S. 436, 467 (1966)). "'Prior to any [custodial] questioning, the person must be warned that he

---

[5]"[T]his Court has repeatedly warned litigants not to combine multiple issues into a single point of error, thereby risking our overruling the composite point of error as multifarious." *Dickey v. State*, 189 S.W.3d 339, 341 (Tex. App.—Texarkana 2006, no pet.). Colvin has combined his second point of error on appeal with an argument that the jury charge was erroneous because it informed the jury members that they could consider evidence of the extraneous offenses "IN PASSING UPON ACTS PERFORMED IN CONFORMITY WITH THE CHARACTER OF THE DEFENDANT" only if they found that those acts were committed beyond a reasonable doubt. We cite to our discussion of Article 38.37 and overrule this multifarious point of error. *See id.* at 341.

7

has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney . . . .'" *Coffey v. State*, 435 S.W.3d 834, 841 (Tex. App.—Texarkana 2014, pet. ref'd) (quoting *Miranda*, 384 U.S. at 444). "'Under both the Federal constitutional standard and the Texas Confession Statute, evidence obtained as a result of a custodial interrogation is inadmissible unless the State proves the officer gave proper warnings and shows an affirmative waiver of rights by the accused.'"[6] *Id.* at 840–41 (quoting *Hutchison v. State*, 424 S.W.3d 164, 175 (Tex. App.—Texarkana 2014, no pet.) (footnotes omitted)); *see Miranda v. Arizona*, 384 U.S. 436, 444 (1966); *Carter v. State*, 309 S.W.3d 31, 35–36 (Tex. Crim. App. 2010) ("Failure to provide the warnings and obtain a waiver prior to custodial questioning generally requires exclusion of statements obtained."); *Ramos v. State*, 245 S.W.3d 410, 418 (Tex. Crim. App. 2008).

---

[6]Article 38.22, Section 2 of the Texas Code of Criminal Procedure requires an officer to warn a defendant that

    (1)    he has the right to remain silent and not make any statement at all and that any statement he makes may be used against him at his trial;

    (2)    any statement he makes may be used as evidence against him in court;

    (3)    he has the right to have a lawyer present to advise him prior to and during any questioning;

    (4)    if he is unable to employ a lawyer, he has the right to have a lawyer appointed to advise him prior to and during any questioning; and

    (5)    he has the right to terminate the interview at any time . . . .

TEX. CODE CRIM. PROC. ANN. art. 38.22, § 2(a) (West Supp. 2014). Section 3 of this Article prohibits use of an accused's oral statement "made as a result of custodial interrogation . . . unless: . . . prior to the statement but during the recording the accused is given the warnings [listed above] and the accused knowingly, intelligently, and voluntarily waives any rights set out in the warning." TEX. CODE CRIM. PROC. ANN. art. 38.22, § 3(a) (West Supp. 2014).

Arguing that his initially voluntary interview escalated into a custodial interrogation, Colvin moved to suppress his unwarned statements. We review the circumstances of the interrogation to better gauge Colvin's argument.

## A. The Circumstances of the Interrogation

After Jane and Jamie made their outcries against Colvin, they were both interviewed by a local Child Advocacy Center (CAC). On reviewing their CAC interviews, Jeffrey Scott Bruhn, a criminal investigator with the Upshur County Sheriff's Office, decided to directly contact Colvin, who was a correctional officer for the Telford Unit of the Texas Department of Criminal Justice Correctional Institutions Division. At a suppression hearing, Bruhn testified that he called Colvin at work and asked if he would agree to a voluntary interview. Colvin agreed and came to speak with Bruhn on the following day.

Colvin testified at the hearing and admitted that he was not under arrest before the interview. Colvin drove himself to the Upshur County Sheriff's Office, asked to speak to Bruhn, and waited for him in the lobby. Although no *Miranda* warnings were read to Colvin, Bruhn testified that at the very beginning of the interview, he informed Colvin that he was not being held and that he was not under arrest.

The interview lasted a total of three hours. The video recording of the interview demonstrated that Bruhn engaged in the following discussion prior to questioning Colvin,

9

Q. Okay. All right. Like, I talked to you the other day when I spoke to you just briefly on the telephone and just asked you if you'd come and give statement, um, on a case that I'm working. I haven't promised you anything. You came here on your own free will. I haven't promised you anything to get you to come up and give me a statement, have I?

A. No.

The interview began with Colvin's admission that he was residing with Jane and Jamie when they made their outcries against him. As a result of the outcries, he was banished from the home, and some of his property was turned over to Upshur County investigators. Bruhn informed Colvin that his property was at the law enforcement headquarters and discussed releasing the property back to Colvin at the conclusion of the interview.

During the initial part of the interview, Colvin denied any wrongdoing. After Colvin repeatedly claimed that he could not remember committing any indecent acts with the children, Bruhn informed Colvin that he had reviewed the CAC interviews and that Jane "told [him] . . . what went on [and] . . . . [w]hat [Colvin] did." To encourage Colvin's confession, Bruhn said,

[E]very little detail is going to help me prove that you did not do this or that you did do this. So, what I'm saying is, this is your chance to be honest with me. So we make sure that when I send this to the DA's office that everything's correct and that I can prove that you're being honest with me.

Because Colvin remained tightlipped, Bruhn again attempted to extract a confession by asking, "Can you explain to me why . . . [a] girl would tell us . . . you pulled your penis out and she started sucking on your penis? I told you, you came in on your own free [will]. Anything that you tell me, I'm not going to put you in jail today. I'm just simply trying to get your side of the story."

After receiving Bruhn's assurance that he would not be placed in jail on that day, Colvin admitted that there was a "possibility" that he placed his sexual organ inside of Jane's mouth, but

10

that he could not remember how it happened. In an attempt to obtain more detail, Bruhn said, "Listen, [Colvin], I know you did it. . . . I'm just needing you to be honest with me. You've already said . . . [t]he statement that she gave us, gave to CPS. That that's a true statement." Bruhn added, "I believe that you're not this type of person that would do this on a daily basis. But on this day, you've already established that it happened." Then, when Bruhn asked, "Did you place it in her mouth or did she place it in her mouth?" Colvin replied, "I think she did." Colvin also admitted that he had kissed Jamie on the neck, grabbed her bottom, and rubbed on her vagina. Colvin estimated that he had abused the children "maybe ten times." At the suppression hearing, Colvin testified that he felt forced into these confessions.

Claiming that he had "lost everything," Colvin next told Bruhn, "At this point in life I just wish somebody would kill me." After indicating to Colvin that he was going to release the property to him, Bruhn expressed his concern during the interview, stating, "Earlier when I was talking to you, you made the comment . . . you wanted somebody to kill you. Now my concern is I sure don't want something to happen to you." He told Colvin,

> At this point, you're not free to leave because I'm trying to figure out what I'm gonna do. If we're gonna have a mental evaluation and you go and talk to the judge . . . I'd hate for - since you made the statement, that you want to die or want somebody to kill you, I sure would hate for you to leave my office and something bad happen . . . I'm just having to take precautions.

Bruhn asked for Colvin's patience while he called the district attorney's office to obtain advice on how to handle the situation. When he returned, Bruhn informed Colvin that he had spoken with the district attorney's office and that they advised placing him into custody "because of the mental state of you being upset and the charges that are going to be filed against you."

11

At the suppression hearing, Bruhn testified that he decided to arrest Colvin for his own safety because Colvin's statement led him to believe that Colvin might pose a risk to himself. Colvin was arrested and searched after telling Bruhn that he understood the reasoning for the precaution. Jill McCauley, a jail lieutenant at the Upshur County Sheriff's Office, testified that Colvin's jail records confirmed that Colvin was taken into custody and was placed on a suicide watch.

After reviewing this evidence, the trial court denied Colvin's motion to suppress and decided to submit the question of the confession's voluntariness to the jury. Colvin argues that the trial court erred in failing to suppress his incriminating statements because it amounted to a custodial interrogation obtained in violation of *Miranda*.

### B.      Standard of Review

"An officer's obligation to administer *Miranda* warnings attaches . . . 'only where there has been such a restriction on a person's freedom as to render him 'in custody.''" *Stansbury v. California*, 511 U.S. 318, 322 (1994) (per curiam) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam)). Likewise, the Article 38.22 constraints on the use of an accused's statements apply only to custodial interrogations. *Wolfe v. State*, 917 S.W.2d 270, 282 (Tex. Crim. App. 1996). Thus, "[i]f an accused is not in custody when he makes a statement, then the question of voluntariness does not arise." *Id*. "Stationhouse questioning does not, in and of itself, constitute custody." *Dowthitt v. State*, 931 S.W.2d 244, 255 (Tex. Crim. App. 1996).

In *Thompson*, the United States Supreme Court clarified that determination of whether a suspect is in custody turns on (1) a factual determination of the circumstances surrounding the

12

interrogation and (2) a legal determination of whether, under the factual circumstances, a reasonable person would feel that he was not free to terminate the questioning and leave. *Thompson*, 516 U.S. at 112–13. "'[T]he ultimate inquiry is simply whether there [was] a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest.'" *Stansbury*, 511 U.S. at 322 (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (per curiam)).

"[T]he trial court is the 'sole and exclusive trier of fact and judge of the credibility of the witnesses' and the evidence presented at a hearing on a motion to suppress, particularly where the motion is based on the voluntariness of a confession." *Delao v. State*, 235 S.W.3d 235, 238 (Tex. Crim. App. 2007) (citations omitted); *Green v. State*, 934 S.W.2d 92, 98 (Tex. Crim. App. 1996); *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990); *see Bizzarri v. State*, 492 S.W.2d 944, 946 (Tex. Crim. App. 1973). Thus, in reviewing the trial court's factual determination of the circumstances surrounding the interrogation, we give almost total deference to the trial court. *Martinez v. State*, 348 S.W.3d 919, 922–23 (Tex. Crim. App. 2011). However, because the question of whether a reasonable person would feel that he was not free to terminate the questioning and leave is a mixed question of law and fact that does not depend on the trial court's credibility determination, we employ a de novo standard when evaluating this question. *Thompson*, 516 U.S. 113–14; *State v. Saenz*, 411 S.W.3d 488, 490 (Tex. Crim. App. 2013).

### C. Analysis

The State argues that Colvin's statement was voluntary because he came to the sheriff's office of his own volition, was initially told that he was free to leave, and was not handcuffed or

otherwise deprived of his freedom of movement. Yet, "the mere fact that an interrogation begins as noncustodial does not prevent custody from arising later; police conduct during the encounter may cause a consensual inquiry to escalate into custodial interrogation." *Dowthitt*, 931 S.W.2d at 255.

The Texas Court of Criminal Appeals has outlined four general situations which may constitute custody, including

> (1) when the suspect is physically deprived of his freedom of action in any significant way, (2) when a law enforcement officer tells the suspect that he cannot leave, (3) when law enforcement officers create a situation that would lead a reasonable person to believe that his freedom of movement has been significantly restricted, and (4) when there is probable cause to arrest and law enforcement officers do not tell the suspect that he is free to leave.

*Id.*; *State v. Ortiz*, 382 S.W.3d 367, 376 (Tex. Crim. App. 2012). Colvin argues that the third and fourth factors apply.

While the first three factors "indicate[] that the restriction upon freedom of movement must amount to the degree associated with an arrest as opposed to an investigative detention," the last factor "dictates that the officers' knowledge of probable cause be manifested to the suspect. . . . [and that] the manifestation of probable cause, combined with other circumstances, would lead a reasonable person to believe that he is under restraint to the degree associated with an arrest." *Dowthitt*, 931 S.W.3d at 255. The "reasonable person" is presumed to be innocent. *Id.* at 254 (citing *Florida v. Bostick*, 501 U.S. 429, 438 (1991)). Further, a "determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury*, 511 U.S. at 323.

14

Here, prior to any incriminating statement, Bruhn informed Colvin that he had reviewed the children's CAC interviews and knew the details of Jane's and Jamie's accusations against him. He divulged the details of Jane's accusation to Colvin during the questioning. While Bruhn stated that he was not going to arrest Colvin on that day, he did not inform him that he could terminate the interview at any time. Colvin admitted that there was a "possibility" that he placed his sexual organ inside of Jane's mouth, but could not remember how it happened. This statement was incriminating, and a reasonable person would have realized as much. *See Dowthitt*, 931 S.W.2d at 257 ("While appellant did not admit to committing the offenses, his admission that he was present during the murders was incriminating, and a reasonable person would have realized the incriminating nature of the admission."). Bruhn failed to inform Colvin that he was free to leave after he incriminated himself. Before Colvin's full confession, Bruhn told Colvin, "I know you did it." Bruhn ultimately arrested Colvin. These facts tend to show that after Colvin made his initial incriminating statement that there was a possibility that he committed sexual assault, his remaining unwarned statements occurred at a time when he may have been in custody.

However, these facts, taken alone, are not dispositive; instead, the totality of the circumstances controls the determination of whether a reasonable person would feel that he is free to leave. *Hutchison v. State*, 424 S.W.3d 164, 177 (Tex. App.—Texarkana 2014, no pet.); *see Stansbury*, 511 U.S. at 325 ("Even a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue."). "[T]he ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the

15

degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (quoting *Mathiason*, 429 U.S. at 495).

Based on the circumstances surrounding the interrogation, the trial court could have found, within its discretion, the following facts tending to show that when Colvin made his incriminating statements, the interrogation was noncustodial:[7] Colvin came to the station voluntarily at a reasonable time; Colvin was not searched or handcuffed and had freedom of movement; Bruhn was the only law enforcement officer present during the questioning; Bruhn conducted the entire interview in a non-confrontational tone; Colvin was not denied food, water, or other facilities; prior to Colvin's admission, Bruhn informed Colvin that he would be releasing Colvin's property to him and would not put him in jail that day; Bruhn did not pressure or coerce a confession from Colvin; Colvin was left in the room alone for several minutes; the length of the interview was three hours; even after Colvin made all of his incriminating statements, Bruhn discussed releasing Colvin's property back to him.

Bruhn manifested the existence of probable cause to Colvin. However, the existence of a manifestation of probable cause "will not automatically establish custody; rather, custody is established if the manifestation of probable cause, combined with other circumstances, would lead a reasonable person to believe that he is under restraint to the degree associated with an arrest." *McCulley v. State*, 352 S.W.3d 107, 116 (Tex. App.—Fort Worth 2011, pet. ref'd) (citing *Dowthitt*, 931 S.W.2d at 255) (considering twelve hours of interrogation endured prior to incriminating statements and other facts demonstrating police control over defendant in finding that custody

---

[7]Colvin did not request, and the trial court did not provide, findings of fact and conclusions of law.

16

began after defendant admitted his presence at scene of murder); *see Rodgers v. State*, 111 S.W.3d 236, 241 (Tex. App.—Texarkana 2003, no pet.).

Here, Bruhn assured Colvin that he would not arrest him and that he would release Colvin's property to him. In light of Bruhn's assurances and the absence of police coercion and control, the circumstances show that Colvin acted on Bruhn's urging without threat that he would be taken forcibly, which is not enough to establish custody. *See Dancy v. State*, 728 S.W.2d 772, 778–79 (Tex. Crim. App. 1987). The fact that Bruhn decided to arrest Colvin after Colvin's indication that he might harm himself does not impact our analysis of whether Colvin was in custody at the time he confessed to Bruhn. Thus, we find that at the time of Colvin's confessions, a reasonable person would not believe that he was currently under restraint to the degree associated with an arrest. *See Wilson v. State*, 442 S.W.3d 779, 784–87 (Tex. App.—Fort Worth 2014, pet. ref'd).[8] Accordingly, Colvin's initially voluntary interview remained an investigative detention until Bruhn informed Colvin, after speaking with the district attorney about Colvin's mental state, that he was not free to leave.

Because Colvin was not in custody at the time of his confessions, the trial court did not err in admitting Colvin's unwarned statements. Therefore, we overrule Colvin's third point of error.

---

[8]Again, in a multifarious point, Colvin contends that the trial court held a *Jackson v. Denno* hearing and improperly concluded that Colvin's statement was voluntary. *See Jackson v. Denno*, 378 U.S. 368 (1964). "If the record shows that there was 'official, coercive conduct of such a nature' that a statement from the defendant was 'unlikely to have been the product of an essentially free and unconstrained choice by its maker,' the defendant's will was overborne," and the confession is involuntary. *Jackson v. State*, 424 S.W.3d 140, 151 (Tex. App.—Texarkana 2014, pet. ref'd) (quoting *Alvarado v. State*, 912 S.W.2d 199, 211 (Tex. Crim. App. 1995)). On the other hand, "'[a]bsent [coercive] police conduct causally related to the confession, there is simply no basis for concluding any state actor has deprived a criminal defendant of due process of law.'" *Alvarado v. State*, 912 S.W.2d 199, 211 (Tex. Crim. App. 1995) (quoting *Colorado v. Connelly*, 479 U.S. 157, 169 (1986)). At trial, Colvin made no argument related to coercive police conduct. We overrule this multifarious point of error. *See id.*

17

**IV.     The State Did Not Use a Prior Inconsistent Statement**

In his last point of error, Colvin argues that he was harmed when the trial court erroneously allowed the State to use statements he made under oath at the suppression hearing for the purposes of impeaching his direct testimony at trial.

Colvin waived his right to remain silent and elected to testify during the guilt/innocence phase of his trial. He professed his innocence to the jury and claimed that he gave a false confession because (1) he "was emotionally distressed over matters that had been happening in [his] life," and (2) he felt that he could not leave Bruhn's interrogation until he "g[a]ve [Bruhn] what he wanted to hear." Colvin told the jury that he upset Jane and Jamie by making fun of them and that they fabricated their accusations to retaliate against him.

Prior to cross-examination, the following discussion ensued:

> [BY THE STATE]: . . . . In our pretrial matter [] called for the limited purposes of that hearing . . . under oath he admitted that he in fact committed these offenses against both girls. Now he's trying to say false confession. I think I have a right to have that transcribed, have it available so that I can impeach him with a prior inconsistent statement under oath before the court.

> [BY THE DEFENSE]: Your Honor, that was a limited purposes only for the admissibility of the statement . . . .

> . . . .

> [BY THE STATE]: Well, no, this is about impeachment and I've got a right to impeach him with a prior inconsistent statement.

> [BY THE DEFENSE]: I'm going to object.

The trial court overruled Colvin's objection and gave the following limiting instruction to the jury:

> Members of the Jury, testimony from a prior hearing is about to be offered solely for the purpose of impeachment of the credibility of the witness if the jury believes

18

it and not to prove the guilt of the defendant if any. So with that limiting instruction this testimony will be elicited.

The State then engaged Colvin in the following exchange:

> Q.     I'm going to show you which is a transcription from that hearing on Tuesday outside the presence of the jury. I'd like for you to focus your attention on line 6 to line 9. Okay. This is the question: So you still admit your guilt or you did at the time just like the statement says; is that correct? What was your response?
>
> A.     The response says, yes, sir.
>
> Q.     You admitted your guilt under oath Tuesday of this week outside the presence of the jury and then while -- when the trial started, knowing the consequences, knowing what this jury is going to do to you, seeing those girls testify, you get on the stand and you're lying before this jury under oath, aren't you?
>
> A.     No, sir, at the time whenever I was asked that question I was talking about the video, sir.

Colvin clarified that he was not admitting guilt at the prior hearing, but was simply repeating what was on the video-recorded interview.

Colvin argues that he was harmed by the erroneous admission of his prior inconsistent statement. Contrary to Colvin's assertion, the State did not impeach him with a prior inconsistent statement. Instead, the State offered statements made by Colvin at the suppression hearing that were consistent with and bolstered his direct testimony at trial. Because it is meritless, we overrule Colvin's last point of error.[9]

---

[9]In the prior hearing, the State asked Colvin a compound question: "So you still admit your guilt or you [admitted your guilt] at [the] time [you gave the statement]; is that correct?" Since Colvin's answer—"Yes, sir."—could have been in response to either question, he did not clearly admit his guilt, and, therefore, the testimony was not inconsistent with his trial testimony. When the State sought to characterize his affirmative answer as an admission of guilt in its follow-up question, Colvin clarified that his answer was in response to "you [admitted your guilt] at [the] time [you gave the statement]," i.e., what he said on the video recording. This was consistent with his trial testimony.

19

## IV.    Conclusion

We affirm the trial court's judgment.

Bailey C. Moseley
Justice

Date Submitted:    April 15, 2015
Date Decided:    May 12, 2015

Publish